Brassard, Raymond J., J.
The plaintiff Linda Johansson (“Johansson”) filed a complaint with the Superior Court pursuant to G.L.c. 30A, §14(7), seeking judicial review of the decision of the Full Commission of the Massachusetts Commission Against Discrimination (the “Full Commission”). The matter is before the court on Johansson’s motion for judgment on the pleadings. For the reasons set forth below, the motion is DENIED and the Full Commission’s decision is AFFIRMED.
BACKGROUND
I. Relevant Facts
Johansson began her employment with the Massachusetts Department of Correction (the “DOC”) as a Correction Counselor/Caseworker at MCI-Concord in 1984. In 1989, Johansson suffered a work-related injury to her neck and back, and thereafter, went on industrial accident disability leave. In April of 1990, while still on leave, Johansson began to receive anonymous, threatening, and sexually explicit phone calls. The caller was later identified as a former inmate at MCI-Concord who had been assigned to Johansson during his incarceration and who was currently on parole. The former inmate was arrested and returned to MCI-Concord. Beginning on May 19, 1990, Johans-son made repeated requests to the DOC to hold the inmate in isolation or to transfer him to another facility. The inmate was transferred in December 1990 after his case was adjudicated.
On June 19, 1990, an Independent Medical Examiner (“IME”) assessed Johansson’s neck and back injury and cleared her to return to work. The Superintendent of MCI-Concord notified Johansson that she was expected to return to work no later than July 24, 1990. Johansson, however, told the Deputy Superintendent of MCI-Concord that she intended to file for industrial accident leave based on severe anxiety suffered as a result of the threatening telephone calls.
At various times during July of 1990 Johansson communicated with officials at MCI-Concord that she was unable to return to work. Johansson’s psychiatrist diagnosed her as suffering from Post-Traumatic Stress Disorder (“PTSD”). In a letter dated July 20, 1990, Johansson’s psychiatrist stated that she “is totally disabled from work at present, and may be permanently unable to work in the prison system or *192 with criminals.” On August 3, 1990, Johansson filed a claim for disability based on psychological injuries suffered as a result of the inmate’s threats.
In September of 1990, a Civil Service examination was scheduled for the position of Correction Counselor I, the position that Johansson held as a provisional Civil Service employee. The Department of Personnel Administration required all provisional employees in the Counselor I position to pass the examination and a certification interview in order to maintain their Civil Service status. Johansson requested permission to meet the Civil Service requirements in a neutral setting. The DOC allowed Johansson to take the Civil Service examination at the DOC’s Central Office in Boston in Februaiy of 1991.
During this period, Johansson’s psychiatrist sent various letters dated September 14, 1990, October 19, 1990, and March 15, 1991 reiterating that she was totally disabled and could not return to work. On October 12, 1990, Johansson filed another claim for disability alleging that she had suffered mental stress and injury resulting in total disability. On May 6, 1991, an IME found Johansson to be disabled and unable to resume her duties. The IME noted that while Johansson appeared to be motivated to resume a productive life, “more time and treatment is required, before she can take significant steps in that direction.”
Johansson also continued to communicate to the DOC that she could no longer work with inmates or in a correctional setting. In a letter to the DOC dated September 30, 1991, Johansson wrote that she could “no longer tolerate either mentally, physically, or emotionally any contact with the [DOC].” In a letter dated November 1, 1991, Johansson informed the DOC that:
It would be impossible for me to return to work at the [DOC] due to these circumstances that have destroyed my life. I have been deemed totally disabled by the physicians and psychologists presently treating me ... I have been suffering from this situation since April of 1990, and there has been no respite or relief in sight . . . My medical and psychological problems continue to render me totally disabled from performing any work position ... I cannot be expected to return to work within the [DOC] at this time, nor possibly at any time in the near future.
On November 8, 1991, Johansson met with a DOC official to request that the Civil Service certification interview be conducted in a non-prison setting. Johansson alleges that during this meeting she also requested a reassignment from MCI-Concord to the Central Office in Boston should she be able to return to work. In a letter also dated November 8, 1991, Johansson’s psychiatrist wrote that he “strongly recommended to [Johansson] that she not return to the Concord prison for any reason whatsoever. This would be very harmful to her and worsen her condition.” The DOC required Johansson to appear for the certification interview at MCI-Lancaster on November 21, 1991.
On November 12, 1991, one of Johansson’s physicians stated that she was totally disabled due to her neck and back injury, which was exacerbated by stress.
On November 19, 1991, an IME performed a physical evaluation of Johansson to determine the status of her neck and back injury. The IME physically cleared Johansson to return to work. However, the IME noted that Johansson was “feeling suicidal” and planned to speak with her personal psychiatrist to suggest hospitalization. The IME also observed that Johansson was “terrified of return to the prison atmosphere” and believed that she was “severely impaired” by her psychological injury.
On November 22, 1991, an IME performed a “comprehensive psychiatric evaluation” on Johansson and reported that she could resume her duties as a Correction Counselor I with the restriction that she not work in the same institution as the inmate convicted of making the threatening phone calls against her.[2] The IME stated that Johansson’s symptoms did not reach the severity of PTSD and that she had fully recovered from the April 1990 incident.[3]
By letter dated December 5, 1991, Johansson requested the accommodation that any further Civil Service requirements be conducted in a neutral setting. Johansson stated that she was complying with the Civil Service requirements to “preserve my rights at this time.”
On Februaiy 19, 1992, Johansson’s psychiatrist reiterated that she was suffering from PTSD and that her symptoms were still severe. He stated that Johans-son was pessimistic “about having any future worthwhile life.” By letter dated February 26, 1992, another of Johansson’s medical providers wrote to contest the November 22, 1991 IME report. The letter stated Johansson was exhibiting symptoms of PTSD and that the IME report “seems to contradict all that I know about [Johansson] and her victimization . . . and I have [been] seeing her for 2 years.”
By memo dated May 4, 1992, the Superintendent of MCI-Concord requested Johansson be transferred to an alternate facility.’ The memo stated, “In November of 1991, [Johansson] was examined both physically and psychiatrically [sic] to determine her fitness for return to her duties. Two separate examinations revealed that she did not have physical or psychiatric symptoms that would disable her from performing her usual duties as a Correction Counselor with the [DOC].”
On June 2, 1992, the DOC sent Johansson a letter stating that she had been appointed Temporary Correction Counselor I at MCI-Concord effective November 27, 1991.
*193 On May 4, 1994, Johansson’s psychiatrist advised that her psychological injury was total and permanent. He stated, “[a]s her state has become and remained over the past several years, [Johansson] is markedly limited in her ability to function in public or at reasonable mental tasks.” In finding that her disability was permanent, he noted that “[t]his disorder has not improved in three years of treatment” and “there has been no evidence to suggest any likelihood that this condition will improve over any passage of time, making the condition permanent and irreversible.”
On July 13, 1994, Johansson reached a compromised lump sum settlement with the DOC in the amount of $100,000 for the head and neck injury and the psychological injury. Johansson has never returned to work after initially going on disability leave in 1989.
II. Procedural History
On January 22, 1992, Johansson filed a complaint with the Massachusetts Commission Against Discrimination (“MCAD”) alleging that the DOC failed to accommodate her handicap with respect to the taking of the Civil Service examination. On October 8, 1992, Johansson amended her complaint to instead allege that the DOC failed to provide her with an accommodation with respect to the location of the Civil Service certification. On February 24, 1995, Johansson amended her complaint for a second time, this time alleging she was subjected to disparate terms and conditions of employment on the basis of gender.
A public hearing on the matter was held in September of 1997. On July 19, 1999, the Hearing Commissioner issued a decision concluding that the DOC violated G.L.c. 151B, §4(16)’s prohibition against handicapped discrimination when it failed to consider the accommodation of a lateral job reassignment until after Johansson filed her complaint with MCAD. The DOC filed a petition for review by the Full Commission.
On July 2, 2003, the Full Commission reversed the decision of the Hearing Commissioner concluding that the Hearing Commissioner erred as a matter of law. The Full Commission found that under Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443 (2002), Johansson could not bring her claim because she was seeking a new job as an accommodation.
Upon judicial review, the Superior Court affirmed the decision of the Full Commission. On March 19, 2007, the Appeals Court reversed the Superior Court’s decision and found that the Full Commission erred as a matter of law when it failed to determine whether the DOC’s duty to engage Johansson in an interactive dialogue had been triggered before concluding that the DOC had no obligation to create a new job in accordance with Russell. The Appeals Court further concluded that the Full Commission decision did not provide a sufficient basis for determining whether Johansson had proved her prima facie case of handicap discrimination. Consequently, it remanded the matter to the Full Commission for more complete findings.
On May 28, 2010, the Full Commission found that the record lacked substantial evidence to support a conclusion that the affirmative obligation to engage in an interactive process was triggered by the events in the case. Furthermore, the Full Commission concluded that: (1) Johansson failed to establish a prima facie case of handicapped discrimination under G.L.c. 15 IB, §4(16) because she was not a qualified handicapped person; and (2) she failed to overcome the apparent contradiction between her receipt of disability benefits and her claim that she was discriminated against by the DOC’s failure to provide an accommodation.
On June 28, 2010, Johansson filed a complaint in the Superior Court seeking judicial review of the Full Commission’s decision pursuant to G.L.c. 30A, §14. Johansson now moves for judgment on the pleadings arguing that the decision was not based on substantial evidence and was in error of law.
DISCUSSION
Pursuant to G.L.c. 30A, §14(7), this court may affirm, reverse, remand, or modify an agency decision if “the substantial rights of any party may have been prejudiced” because the agency decision is based on an error of law, on an unlawful procedure, is arbitrary and capricious, is unwarranted by facts found by the agency, or is unsupported by substantial evidence. See G.L.c. 30A, § 14(7). The burden of showing that the agency’s decision is invalid is on the party challenging the decision. Merisme v. Board of Appeal on Motor Vehicle Lab. Policies & Bonds, 27 Mass.App.Ct. 470, 474 (1989).
In reviewing the agency’s decision, the court must give “due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” G.L.c. 30A, §14(7). The court may not substitute its judgment for that of the agency. See Southern Worcester County Reg. Voc. Sch. Dist. v. Labor Relations Comm’n, 377 Mass. 897, 903 (1979). Further, the “court may not displace an administrative board’s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.” Labor Relations Comm’n v. University Hosp., Inc., 359 Mass. 516, 521 (1971).
I. The Full Commission did not err in finding that the DOC’s duty to engage in the interactive process was not triggered by the events in this case.
To state a prima facie case of handicapped discrimination under G.L.c. 151B, §4(16) based uponafailure to accommodate, a plaintiff must show: (1) “she is a *194 handicapped person within the meaning of the statute”; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation (i.e. a qualified handicapped person); (3) “she requested a reasonable accommodation”; and (4) “she was prevented from performing her job because her employer failed to reasonably accommodate the limitations associated with her handicap.” See Mazeikus v. Northwest Airlines, Inc., 22 Mass.Discrim.L.Rptr. 63, 68 (2000).
An employee’s request for an accommodation triggers an affirmative duty on the part of the employer to engage in an interactive process in an attempt to offer an accommodation. See Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 457 (2002). According to the MCAD Guidelines, this affirmative duty is also triggered when: (1) the employer is aware of the employee’s disability; and (2) the employer observes that the employee is having a difficult time on the job. See Massachusetts Commission Against Discrimination Guidelines: Employment Discrimination on the Basis of Handicap §VII(A) [hereinafter MCAD Guidelines].[4] If the employee is not a qualified handicapped person, the employer does not have a duty to engage in the interactive process because the issue of accommodation is moot. See Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 125 (2010) (“Since at the time his employment was terminated the plaintiff was unable to perform one of the essential duties [of his position], with or without a reasonable accommodation, he was not a qualified handicapped person pursuant to G.L.c. 151B, §4(16), and the [employer] had no obligation to engage in dialogue concerning a nonexistent possibility of accommodation”).
The Hearing Commissioner found that the duty on the part of the DOC to engage in an interactive process concerning the accommodation of Johansson was triggered both because Johansson requested an accommodation and because' Johansson had provided sufficient information to the DOC to put it on notice that she needed an accommodation for PTSD.
The Full Commission reversed the decision of the Hearing Commissioner finding that the duly to engage in an interactive process was not triggered because Johansson never requested an accommodation and nothing triggered the duty absent a request.[5] Johansson argues that the substantial weight of the evidence supports an opposite conclusion. This is not the case.
A. The Full Commission could properly conclude that Johansson did not request an accommodation.
Several pieces of evidence, relied on by the Full Commission, support the conclusion that Johansson did not request an accommodation or communicate a desire to return to the workplace. First, Johansson’s alleged request came shortly after she sent the DOC two letters expressing the fact that she was totally disabled. One letter specifically noted that “[i]t would be impossible for me to return to work at the [DOC].” Second, none of Johansson’s personal medical providers ever asserted that her condition had so improved that she could return to work. Indeed, Johansson’s psychiatrist consistently maintained that she was totally disabled. Third, throughout her testimony concerning the alleged accommodation request, Johansson repeatedly described the request as something that could be done in the future if she could recover from her disability. Specifically, when testifying about the November 8, 1991 meeting, Johansson stated “I was explaining the disability that I had and my hopes that I would recover at some point in time, and that I would have a job to return to, and if I could not work in a prison setting per se, there would be some option afforded to me . . .” (emphasis added).[6] At no point did Johansson describe the possible transfer as a present request or indicate that she had recovered such that she could presently return to work at the Central Office.
Johansson argues that the medical information sent after her alleged request confirms that she was capable of returning to work and that she made a request for an accommodation. She points to the November 8, 1991 letter from her doctor stating that “she should not return to Concord” as it could “worsen her condition” and requesting other means of accommodating her. Johansson also relies on the November 19, 1991, and November 22, 1991 IME reports, which she suggests cleared her for work. Johansson further urges that the May 4, 1992 DOC memo recommending that she be transferred from MCI-Concord and the June 2, 1992 letter stating that she had been appointed Temporary Correction Counselor I at MCI-Concord support the conclusion that she requested an accommod ation.
These documents, however, do not show that Johansson was capable of returning to work or that she requested an accommodation. The November 8, 1991 letter from her psychiatrist was written specifically for Johansson’s request to have her certification interview conducted in a non-prison setting and was not referencing her ability to return to work. Moreover, the November 19, 1991 IME report only dealt with Johansson’s physical ability to return to work and, in fact, noted that her psychological injury was severely impairing.
Additionally, the November 22, 1991 IME report is not a clear indication of her accommodation request given that her medical providers consistently maintained that she was totally disabled and unable to return to work. The report came shortly after the two letters from Johansson to the DOC stating that she was unable to return to work and the IME report ofNovember 19, 1991 that declared that Johansson was suicidal and discussed the possibility of forced *195 hospitalization. Importantly, at no time after the IME report was issued did Johansson or any of her medical providers confirm the IME’s findings. While Johansson’s psychiatrist wrote a letter in support of her request to conduct the Civil Service certification interview in a neutral setting, he made no representation to the DOC that Johansson could return to work with an accommodation.
Lastly, during the public hearing a DOC official testified that the May 4, 1992 memo was only meant to resolve Johansson’s industrial accident claim and was not based on a transfer request. The DOC official further testified that the June 2, 1992 letter was merely to advise Johansson of her new Civil Service status after she had completed the necessary requirements and was not a request for her to return to work. This is corroborated by the fact that the DOC never officially requested Johansson to return to work or provided her with a return date.
B. The Full Commission could appropriately find that the DOC had no duty to initiate an interactive process absent a request.
The Full Commission also properly concluded that, even absent a request, no duty to initiate an interactive process was triggered by the DOC’s knowledge of Johansson’s disability. See Russell, 437 Mass. at 457 (“It is the employee’s initial request for an accommodation which triggers the employer’s obligation to participate in the interactive process of determining one”). First, as the Full Commission observed, Johansson’s total disability leave made it unclear whether she had a present interest to return to work or a present ability to return absent a request. Cf. id. at 452-54, 457.[7] Second, all the medical information provided to the DOC, except for the November 22, 1991 IME report, indicated that she could not resume her usual duties even with restrictions. See Sullivan v. Raytheon Co., 262 F.3d 41, 48 (1st Cir. 2001) (“Because [the plaintiff] has presented no evidence to indicate that he was capable of returning to work [in his position], even with a reasonable accommodation, [the defendant] was not required to engage with him in an interactive process”). An employer is not required to accommodate a need that it does not know exists. See Ocean Spray Cranberries, Inc. v. Massachusetts Comm’n Against Discrimination, 441 Mass. 632, 649 n.21 (2004). Because the vast majority of medical information and Johansson’s own statements maintained that she was incapable of returning to the workplace, no duty to engage in an interactive process was triggered. See DeCaro v. Hasbro, Inc., 580 F.3d 55, 63 (1st Cir.2009) (“an employer’s duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of his job with an accommodation”).
II. The Full Commission did not err in finding that Johansson failed to resolve the apparent contradiction between her receipt of total disability benefits and her claims that the DOC discriminated against her for failing to consider a reasonable accommodation.
The Full Commission further found that, even if Johansson had requested an accommodation, she still could not have prevailed because she failed to rebut the contradictions áiising from her assertions of total disability in connection with her disability benefits and her claim that she was discriminated against by the DOC’s failure to provide an accommodation. The Full Commission’s determination is not against the substantial weight of the evidence and is free from error of law.
The receipt ofbenefits based on an assertion of total disability does not automatically estop a claim of handicapped discrimination under G.L.c. 15 IB, §4(16). Russell 437 Mass. at 452. However, the plaintiff must be able to either: (1) “raise a question of fact through other evidence of her ability” to perform the essential functions of her job with or without an accommodation; or (2) offer an “explanation of how her disability claims and employment discrimination claims are consistent, sufficient to warrant a reasonable juror’s conclusion that the plaintiff could perform the essential functions of the job.” See id. In Russell for example, the court concluded that a plaintiff had met this burden because she communicated to her employer that she wanted to return to work and obtained a medical release clearing her to return to work. See id. at 452-53.
Here, Johansson failed to show that her receipt of total disability benefits and her claim for disability discrimination are not mutually exclusive. Unlike the plaintiff in Russell, Johansson never communicated a willingness or an ability to return to work. In her testimony before the Hearing Commissioner, Johans-son stated that in the November 8, 1991 meeting where she allegedly requested an accommodation that she made the request in the hopes that she “would recover at some point.” Johansson testified “I was not sure as of 1991 if I would ever be able to return to anything.” Further, none of Johansson’s medical providers ever cleared her to work and almost all of their documentation stated that she was totally disabled.
The only piece of evidence suggesting that Johans-son had sufficiently recovered from her psychological injuiy to return to work in any capacity was the November 22, 1991 IME report, which was later reversed. Neither Johansson nor her medical providers ever confirmed the IME report. In fact, at least one of Johansson’s medical providers specifically rejected the IME’s findings. Moreover, the IME who examined Johansson with regards to her back and neck injury on November 19, 1991 stated that he believed that she was “severely impaired” by her psychological injury *196 and was suicidal. Finally, on May 4, 1994, Johansson’s psychiatrist opined “[t]his disorder has not improved in three years of treatment” and “there has been no evidence to suggest any likelihood that this condition will improve over any passage of time, making the condition permanent and irreversible,” suggesting that Johansson had remained totally disabled during the entire period in question.
III. The Full Commission did not err in finding that Johansson failed to make out a prima facie case of handicapped discrimination because she could not show that she was a qualified handicapped person.
The Hearing Commissioner found Johansson was a qualified handicapped person under G.L.c. 151B, §4(16) because the DOC considered her able to perform the essential functions of her job.[8] The Full Commission rejected this conclusion. It determined that Johansson was not capable of performing the essential functions of her job because she could not carry out duties that required inmate contact. The finding of the Full Commission was not against the substantial weight of the evidence or based on an error of law.
As stated in section IA of this memorandum of decision, to state a claim for handicapped discrimination under G.L.c. 151B, §4(16), the plaintiff must show that she was a qualified handicapped person. See Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997). A qualified handicapped person is someone who is able to perform the essential functions of the job with or without reasonable accommodation. See id. at 822. The MCAD Guidelines define essential functions as “those functions which must necessarily be performed by an employee in order to accomplish the principal objectives of the job. Put another way, the ‘essential functions’ are those that are not incidental or tangential to the job in question.” MCAD Guidelines §II(B). Determining whether a duty is essential is fact specific. See Cargill v. Harvard University, 60 Mass.App.Ct. 585, 596-97 (2004). The determination should be “based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved.” Id. at 597 (quoting Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 384 (1993)).
The Full Commission found inmate contact was an essential function of the Correction Counselor I position. In support of this finding, it cited Johansson’s testimony that throughout her employment she maintained an inmate caseload, which required her to receive reports from the probation board and superior court concerning inmates, perform warrant checks, meet with inmates for reviews, prepare classification reports on inmates, and sit as a member of the disciplinary board two or three times a month.
The Full Commission also cited the job description for the Correction Counselor I position. Some of the general duties of the position were listed as: assessing the needs and appropriate placement of inmates, devising program plans to address inmate needs, preparation of inmate classification reports, and conducting intakes of incoming inmates. In addition, a number of the specific duties included: interviewing inmates, developing program plans for inmates, and to be present in the inmate chow hall to address and respond to inmate questions and concerns.
In further support of its finding that inmate contact was an essential function, the Full Commission pointed to the skill set required for the position. These skills included: good oral and written communication skills, ability to deal effectively with inmates, good interviewing skills, working knowledge of applied correctional practices as related to the care and custody of inmates, the ability to assess inmate needs and to identify immediate behavioral and/or management problems, and the ability to develop detailed program plans based upon inmate needs and security concerns.
Lastly, the Full Commission relied on the testimony of Richard Spofford (“Spofford”) whose tenure as a Correction Counselor I at MCI-Concord overlapped Johansson’s for a time. Spofford testified that the position required inmate contact and that he was generally responsible for inmate custody and care. He also suggested that, for him, the clerical nature of the position was less important than dealing with inmates.
Johansson argues that the “bulk” of the functions of the Correction Counselor I position were clerical/administrative in nature and did not require inmate contact. However, even assuming that the “bulk” of Johansson’s duties were clerical, that does not mean inmate contact was nonessential. See Cox, 414 Mass. at 387 (affirming the decision of a Superior Court judge who found even though a function rarely occurred it “is not unforeseeable that this skill would be necessary during an emergency, or even from time to time” and therefore the function was essential). Further, the determination of whether a function is essential is “intensely fact-based, requiring individualized inquiry and . . . appropriate findings of fact." Godfrey, 457 Mass. at 121 (quoting Cargill, 60 Mass.App.Ct. at 587-88) (internal citations omitted). Here, the Full Commission relied on the job description outlining various functions that required inmate contact, Johansson’s testimony admitting that the position required at least some inmate contact, and Spofford’s testimony that the position required him to be responsible for inmate custody and care.[9] This was a sufficient basis for which to form a conclusion that the essential functions of Johansson’s job included and required direct contact with inmates.
Johansson also contends that working with inmates is not an essential function of her former position because there are employees with the same Civil Service job title, Correction Counselor I, at the DOC’s *197 Central Office who do not have inmate contact. This argument, however, fails to take into account the differences in the positions despite their similar titles.
General Laws c. 151B, §4(16) states that the plaintiff must be “capable of performing the essential functions of the position involved with reasonable accommodation.” (Emphasis added.) There is no requirement “that an employer provide a ‘reasonable accommodation’ in the form of a reassignment to new or different position.” Gauthier v. Sunhealth Specialty Servs., Inc., 555 F.Sup.2d 227, 240 (D.Mass. 2008); see Russell 437 Mass. at 454 (finding that G.L.c. 151B, §4(16), does not require an employer to create a new position when an employee is not capable of performing the duties of her former position). As stated above, determining an essential function of a position is based upon more than statements in the job description and job title. See Cargill 60 Mass.App.Ct. at 596-97.
Despite their similar titles, the duties of the two positions are dissimilar and they are best characterized as entirely different positions. The position at the Central Office, unlike the position at MCI-Concord, is clearly more clerical in nature as the employee works with the Commissioner and the Department heads, not inmates. The difference between the two positions is highlighted by the fact that Johansson had to interview for the Central Office position when she applied for it previously in 1989.
Lastly, Johansson argues that she is a qualified handicapped person because the DOC “regarded” her as such. Johansson does not cite to any authority in support of the proposition that being “regarded” as a qualified handicapped person is enough to satisfy the prima facie standard. General Laws c. 151B, §1(17) defines handicapped as “(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment.” (Emphasis added.) The statute, however, defines qualified handicapped person as “a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap.” G.L.c. 151B, §1(16).
ORDER
For the foregoing reasons, Johansson’s motion for judgment on the pleadings is DENIED and it is therefore ORDERED that judgment enter AFFIRMING the decision of the Massachusetts Commission Against Discrimination.

In June of 1992, the same IME re-examined Johansson and came to the opposite conclusion, finding that Johansson was unable to work in any capacity.

The IME further stated: “It may be best if the patient could be assigned to work initially at the central office of the [DOC] so that she would not immediately be dealing with inmates and that after a transitional period she could then be reassigned to work in a corrections institution.”

 The MCAD Guidelines are persuasive and are to be used for interpretive assistance but are not binding. See Leach v. Commissioner of the Massachusetts Rehab. Comm'n, 63 Mass.App.Ct. 563, 567 (2005) (stating that there are situations where an employee’s request for an accommodation is not required, such as where the condition makes it obvious that an accommodation is needed). But see Mammone v. President and Fellows of Harvard Coll., 446 Mass. 657, 669 n.25 (2006) (“despite the dissent’s suggestion that employers should be required to raise affirmatively the issue of a reasonable accommodation with a handicapped employee who does not request such accommodation ... our case law does not support this position”).

The Full Commission specifically made the following findings: (1) Johansson never communicated an interest in returning to work that was other than hopeful repatriation at some unspecified time in the future; and (2) the November 22, 1991 IME report did not trigger an affirmative obligation to engage in an interactive dialogue because Johansson’s statements and the statements of her medical providers all strongly contradicted the report, rendering any dialogue futile. It also: (1) rejected the Hearing Commissioner’s conclusion that Johansson spoke through various medical reports that were in the DOC’s possession; (2) rejected the favorable inference drawn by the Hearing Commissioner from Johansson’s completion of her Civil Service requirements, finding that it only showed a hopeful desire to return to work in the future rather than a present intent to return to work; and (3) noted that Johansson’s original complaint and subsequent amendments supported its conclusion because they did not allege any failure by the DOC to provide her with a lateral job transfer accommodation.

Johansson testified that the November 8, 1991 meeting was brief and that its purpose was related to the Civil Service requirements. Johansson stated that she quickly “broached the subject of returning at some point, I didn’t know when ...” In addition, Johansson stated “I was not sure as of 1991 if I would ever be able to return to anything, and I wanted to preserve the possibility that if by some miracle I would get well and I could Junction again, I wanted the option to have my department say to me, you’re fine, you’re better, come back ...” (emphasis added).

While Russell does not directly stand for this proposition, it does offer some support. See 437 Mass. at 452-53, 454, 457. For example, in determining whether the receipt of disability benefits estopped a claim for handicapped discrimination, the court focused on how the plaintiff had expressed her desire to return to work and obtained medical clearance to return. See id. at 452-53. Also, in discussing accommodations, the court noted that the “plaintiff never requested to return to her former position... nor did she indicate that she would be able to perform the essential functions of that position with accommodation.” Id. at 454. Lastly, when discussing how an employee’s request for an accommodation triggers the duty to engage in the interactive process, the court again noted that the plaintiff gave no indication that she was able to perform the duties of her position with or without an accommodation. See id. at 457.

The Hearing Commissioner based this determination on the following factors: (1) the Superintendent of MCI-Concord notified Johansson on July 10, 1990 that she had been cleared to return to work; (2) Johansson completed the Civil Service requirements; (3) on November 22, 1991 an IME cleared Johansson to return to work with the restriction that she not work in the same facility as the inmate who threatened her; (4) on May 4, 1992 the Superintendent of MCI-Concord requested Johansson to be transferred to another facility; and (5) the Superintendent of MCI-Concord informed *198 Johansson on June 2, 1992 that she had been appointed Temporary Correction Counselor I at MCI-Concord.

The Hearing Commissioner did not make any findings of fact with regards to whether inmate contact was an essential function.